**In re PFIZER INC. SECURITIES LITIGATION.**

No. 04 Civ. 9866(LTS)(DCF).

United States District Court,
S.D. New York.

July 1, 2008.

Grant & Eisenhofer P.A. by Jay W. Eisenhofer, Esq., Geoffrey C. Jarvis, Esq., James R. Banko, Esq., New York, NY, by Stephen G. Grygiel, Esq., Brian M. Rostocki, Esq., Wilmington, DE, for Lead Plaintiff.

Cadwalader, Wickersham & Taft LLP by Gregory A. Markel, Esq., Ronit Setton, Esq., New York, NY, for Defendants.

## OPINION AND ORDER[1]

LAURA TAYLOR SWAIN, District Judge.

Lead Plaintiff Teachers' Retirement System of Louisiana ("TRSL") brings this action on behalf of a putative class of investors ("Plaintiffs") who purchased or acquired Pfizer Inc. ("Pfizer") stock between October 31, 2000 and October 19, 2005 (the "Class Period") against Pfizer and corporate officers Henry McKinnell, John LaMattina, Karen Katen, Joseph Feczko, and Gail Cawkwell (together, the "Individual Defendants") (together with Pfizer, "Defendants"). Plaintiffs allege that Defendants violated federal and state laws by concealing the results of three medical studies concerning two Pfizer drugs, Celebrex and Bextra, and by making misstatements and omissions in their public filings and statements.

Defendants have moved to dismiss the complaint. Plaintiffs have moved to strike certain exhibits attached to and portions of Defendants' memorandum of law in support of their motion to dismiss. The Court has reviewed thoroughly all of the parties' submissions and arguments in connection with these motions. For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part. In light of the resolution of the motion to dismiss, Plaintiffs' motion to strike is moot.

### BACKGROUND

For the purposes of this motion, the Court takes the following facts drawn from the Consolidated Class Action Complaint ("CCAC") as true.

### I. Defendants

Pfizer is a research-based, global pharmaceutical company that develops, manufactures, and markets prescription medi-

<hr />

1. *The ECF system provides notice of the entry of this Order to each party that has both entered an appearance in this case and registered with ECF. The ECF-registered attorneys are responsible for providing notice to any co-counsel whose e-mail addresses are not reflected on the ECF docket for this case, and Lead Plaintiffs counsel, upon receiving notice of this Order, is hereby ordered to fax or otherwise deliver promptly a copy to all parties who are not represented by ECF-registered counsel. A certificate of such further service shall be filed within 5 days from the date hereof Counsel who have not registered for ECF are ordered to register immediately as filing users in accordance with the Procedures for Electronic Case Filing.*

cines for humans and animals, as well as consumer healthcare products. (CCAC ¶ 17.) As of November 4, 2005, Pfizer had approximately 7.37 billion shares outstanding trading on the New York Stock Exchange. (*Id.*) Pfizer is the successor-in-interest of Pharmacia, having acquired Pharmacia—and Pharmacia's interest in Celebrex and Bextra—on or about April 16, 2003, in a transaction valued at $60 billion. (*Id.*)

The Individual Defendants were executive officers of Pfizer during the relevant period. Since 2001, Henry McKinnell has been Pfizer's Chief Executive Officer and Chairman of the Board of Directors. (*Id.* ¶ 18.) John LaMattina has been Senior Vice President and President of Pfizer Global Research and Development since 2003. (*Id.* ¶ 23.) Karen Katen was Executive Vice President and President of Pfizer Pharmaceuticals from April 2001 to March 2005. Thereafter, she became Vice Chairman and President of Pfizer Human Health. (*Id.* ¶ 27.) During the Class Period, Joseph M. Feczko was the President of Worldwide Development, and Gail Cawkwell was Pfizer's medical team leader for Celebrex. (*Id.* ¶¶ 31, 33.)

During the Class Period, McKinnell, LaMattina, and Katen all made strategic decisions for the company. (*Id.* ¶¶ 19, 24, 28.) Furthermore, all of the Individual Defendants made numerous public statements concerning Celebrex and Bextra during the Class Period. (*Id.* ¶¶ 21, 25, 29, 32, 34.) By virtue of their high-level positions and direct involvement in the day-to-day activities of the company, the Individual Defendants were privy to confidential non-public information concerning the operations of Pfizer. (*Id.* ¶ 36.) In addition, the Individual Defendants were involved in drafting, reviewing, approving, ratifying, and/or disseminating the financial statements disclosed by Pfizer. (*Id.*)

## II. Development of Celebrex and Bextra

Celebrex and Bextra, like the well-known drug Vioxx, are non-steroidal anti-inflammatory drugs ("NSAIDs") belonging to a class of drugs known as Cyclooxygenase 2 ("COX–2") inhibitors. (*Id.* ¶ 48.) Celebrex (celecoxib) and Bextra (valdecoxib) were developed to treat chronic pain. (*Id.* ¶¶ 1, 43.) Traditional NSAIDs, such as aspirin, ibuprofen, and naproxen, inhibit both the COX–1 and COX–2 enzymes, and tend to cause harmful gastrointestinal side effects. (*Id.* ¶¶ 42–43.) The COX–1 enzyme promotes the production of the stomach's natural protective mucus lining. (*Id.* ¶ 43.) The COX–2 enzyme is responsible for promoting inflammation. (*Id.*) The possibility of suppressing only the COX–2 enzyme—responsible for inflammation and pain—without inhibiting the COX–1 enzyme meant that COX–2 inhibitors had the potential to harness the beneficial attributes of NSAIDs without the harmful gastrointestinal side effects. (*Id.* ¶ 44.)

Celebrex was the first COX–2 inhibitor to obtain FDA approval, which it received in December 1998. (*Id.* ¶ 48.) The FDA first approved Celebrex for use by prescription for treating pain and inflammation caused by osteoarthritis and adult rheumatoid arthritis. (*Id.* ¶ 50.) Later, Celebrex was approved for the treatment of acute adult pain or pain after surgery, as well as for the treatment of primary dysmenorrhea—painful menstrual cramps. (*Id.*) The FDA approved Bextra in November 2001 for use by prescription for treating osteoarthritis, rheumatoid arthritis, and primary dysmenorrhea, but not for acute pain. (*Id.* ¶ 61.)

Plaintiffs allege that Pfizer's financial success and future prospects depended on Celebrex and Bextra becoming "blockbuster" drugs because of looming patent expiration dates for several of its best-selling drugs. (*Id.* ¶¶ 66.) Pfizer's patents on

Ambien (2006), Zithromax (2005), and Zoloft (2006) were set to expire within five years after Celebrex and Bextra's expected market arrival. (*Id.*) Indeed, initially Celebrex and Bextra were extremely successful. (*Id.* ¶ 69.) By 2004, for example, Celebrex and Bextra accounted for almost nine percent of Pfizer's revenue, totaling over $4.5 billion. (*Id.* ¶ 71.)

Defendants made numerous representations about the safety of Celebrex and Bextra, including that they were safer than Merck & Co. Inc.'s ("Merck") competing drug, Vioxx. (*Id.* ¶ 72.) For example, in an October 18, 2002 press release, Pfizer touted Bextra as an effective and safe form of pain reliever: "Analyses of pooled study results for the COX–2 specific inhibitor BEXTRA ... underscored its improved upper gastrointestinal (GI) safety as well as its cardiovascular safety profile." (*Id.* ¶¶ 88, 187.) On November 13, 2002, Pfizer stated in its 10–Q that "the FDA approved revised labeling for Celebrex. The new prescribing information includes additional gastrointestinal safety data and data indicating that there was no increased risk for serious cardiovascular adverse events observed, including heart attack, stroke and unstable angina." (*Id.* ¶ 188.) On July 25, 2003, on a quarterly conference call, Katten stated that "[a]n independent analysis that included our entire Celebrex arthritis clinical trial database, found no evidence in increased cardiovascular risk for Celebrex, relative to both conventional, non-steroidal anti-inflammatory drugs and placebo." (*Id.* ¶ 194.) The CCAC alleges that Pfizer and its representatives made numerous similar statements throughout the class period. (*Id.* ¶¶ 170–231.)

### III. The Studies

Plaintiffs allege that senior officials at Pfizer, including the Individual Defendants, knew from a very early date that Celebrex and Bextra had adverse cardiovascular effects. (*Id.* ¶¶ 74–82, 248–67.) Specifically, Plaintiffs contend that Defendants were aware of three studies which revealed these adverse effects.

The first, the Alzheimer's Study, completed in 1999, revealed that patients taking Celebrex were more likely to experience negative cardiovascular effects such as stroke or cardiac failure than patients taking a placebo. (*Id.* ¶ 93.) The Alzheimer's Study included 425 patients and, as the name suggests, focused on the effect of Celebrex on patients with Alzheimer's Disease. (*Id.* ¶ 94.) In the study, 285 patients were given Celebrex and 140 were given a placebo. Twenty-two of the patients taking Celebrex and three of the patients taking the placebo suffered adverse cardiovascular effects. (*Id.*) Adverse cardiovascular events were observed in patients taking Celebrex at a rate 3.6 times greater than observed in patients taking the placebo. (*Id.* ¶ 93.) The study's authors concluded that "[a] statistically significant difference favoring placebo in adverse events was observed." (*Id.* ¶ 94.) The study was never published (*id.* ¶ 95), and the results only became public in early January 2005, when Pfizer surreptitiously posted the results on the pharmaceutical industry's main trade group's website. (*Id.* ¶ 97.)

In the second study, the Celecoxib Long–Term Arthritis Safety Study (the "CLASS Study"), Pfizer sought to demonstrate Celebrex's superior gastrointestinal safety profile. (*Id.* ¶ 98.) When the study was completed in March 2000, Pfizer sent the Food and Drug Administration ("FDA") the portion of the study showing the gastrointestinal results. (*Id.* ¶ 99.) Pfizer did not send the FDA another portion of the study, which showed increased risk of cardiovascular problems. (*Id.*) The results of the CLASS Study were published on September 13, 2000, in

an article in the Journal of the American Medical Association ("JAMA"). (*Id.* ¶ 101.) However, the published study and the accompanying JAMA article omitted key information about the study, namely that it covered a twelve-month period, not a six-month period, and revealed that Celebrex posed serious cardiovascular risks. (*Id.* ¶ 102.) Indeed, the full twelve-month data set revealed that the rate of adverse cardiovascular events in the population taking Celebrex was 1.4%, as opposed to rate of 1.0% for the other NSAID groups. (*Id.* ¶ 93.) Furthermore, the results showed an elevated rate of heart attacks. In the Celebrex sample pool, the heart attack rate was 1.6% whereas in the pool taking low-dose aspirin, the rate was 1.2%. (*Id.* ¶ 105.)

In the third study, the Coronary Artery Bypass Graft Trial of Bextra ("CABG Trial"), Pfizer studied 311 patients on Bextra and 151 on a placebo. (*Id.* ¶ 108.) In the course of Bextra's FDA approval, an FDA medical officer commented that "[t]he excess of serious cardiovascular thromboembolic [blood clots] in the valdecoxib arm of the CABG trial . . . is of note as the entire study population received prophylactic low dose aspirin as part of the standard of care in this setting to minimize just such events." (*Id.* ¶ 111.) Pfizer redacted this statement from the publicly-available Bextra Approval package. (*Id.* ¶ 112.) In December 2004, Pfizer quietly released all of the results of the CABG Trial. (*Id.* ¶ 118.) These previously concealed results warned of negative cardiovascular side effects associated with Bextra. (*Id.*)

Plaintiffs allege that Defendants deliberately concealed or misrepresented the results of these studies. According to one member of a safety monitoring board for Celebrex, the Alzheimer's Study "should have been fully published in 2000, and perhaps if it had been some attention might have been drawn to potential safety issues." (*Id.* ¶ 87.) On November 13, 2001, Defendants issued a press release stating that the CLASS Study revealed that "Celebrex (celecoxib capsules) is not associated with an increased risk of cardiovascular (CV) adverse events compared to the NSAIDs studied." (*Id.* ¶ 177.) On September 30, 2004, Pfizer asserted in a press release that "Bextra's cardiovascular safety profile is . . . well established in long-term studies." (*Id.* ¶ 206.) In addition, Plaintiffs allege that Defendants made numerous misstatements and omissions in Pfizer's public filings and statements, thereby misleading investors about the commercial potential of Celebrex and Bextra. *See, e.g., id.* ¶ 181 (stating in a press release announcing Pfizer's fourth quarter and full-year financial results for 2001 that "Celebrex provides strong efficacy, outstanding tolerability, and a superior safety profile to Vioxx. These advantages have translated into a higher refill rate, higher patient satisfaction level, and higher persistence of use for Celebrex"); *id.* ¶ 207 ("Data demonstrate[s] that Celebrex does not increase the risk of heart attack or stroke in patients with arthritis and pain, even at higher-than-recommended doses."); *see also id.* ¶¶ 170–231.

## IV. Revelations About Celebrex and Bextra

On September 30, 2004, Merck withdrew Vioxx from the market. (*Id.* ¶ 120.) That day, Pfizer issued a statement that "[t]he evidence distinguishing the cardiovascular safety of Celebrex has accumulated over the years in multiple completed studies, none of which has shown any increased cardiovascular risk for Celebrex." (*Id.* ¶ 121.) Defendant Cawkwell further stated that "[t]he cardiovascular data for Celebrex and Bextra in the long-term arthritis studies has been good." (*Id.*)

Nevertheless, in late 2004 and early 2005, information about Celebrex and Bextra's negative cardiovascular effects began to emerge. (*Id.* ¶¶ 127–136.) On April 7, 2005, the FDA insisted Pfizer insert a "black box" warning in Celebrex's label. (*Id.* ¶ 141.) A black box warning is the most negative warning the FDA uses, and is the last step before a drug is pulled from the market. (*Id.* ¶ 140.) On the same day, April 7, 2005, Pfizer announced that the FDA had directed it to remove Bextra from the market. (*Id.* ¶ 146.) Currently, Celebrex is sold with a black box warning label. (*Id.* ¶ 7.) Bextra remains off the market. (*Id.*) During the Class Period, Pfizer stock rose to a high of $47.44 per share before falling to $21.09. (*Id.* ¶ 150.)

## V. *Claims Asserted*

Plaintiffs assert the following causes of action: Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder by making materially false statements or omissions about the commercial viability of Celebrex and Bextra (Count I); Defendants violated Section 10(b) and Rule 10b–5(a) and (c) specifically by creating a scheme to defraud Plaintiffs (Count II); and Individual Defendants McKinnell, LaMattina, and Katen violated Sections 20(a), 18, and 20A of the Exchange Act (Counts III, VI, and VII, respectively). Finally, Lead Plaintiff TRSL and a subclass assert claims of common law fraud and violations of state securities law against all Defendants (Counts IV and V, respectively).

## DISCUSSION

## I. *Rule 12(b)(6) and 9(b) Standards*

■ In deciding a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir.2007) (citation omitted). The issue is whether the plaintiff is entitled to offer evidence to support the claims. *Hudson Valley Black Press v. Internal Revenue Service*, 307 F.Supp.2d 543, 545 (S.D.N.Y.2004). Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (requiring plaintiff to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]"); *see also ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) ("We have declined to read *Twombly*'s flexible 'plausibility standard' as relating only to antitrust cases.").

■ In deciding a motion to dismiss, a court may consider documents which are integral to the complaint or are incorporated by reference in the pleadings. *Rizzo v. The MacManus Group, Inc.*, 158 F.Supp.2d 297, 301 (S.D.N.Y.2001) (a court may consider "documents that are incorporated by reference in the pleadings" when deciding a motion to dismiss under Rule 12(b)(6)); *Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 328 (S.D.N.Y.1993) (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) (in deciding a motion to dismiss, a court "may consider documents which form the basis of allegations of fraud if the documents are 'integral to the complaint'")). A court may also take judicial notice of facts "not subject to reasonable dispute" either because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.

R.Evid. 201(b); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

■ Rule 9(b) of the Federal Rules of Civil Procedure governs pleading in fraud actions generally, providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (internal quotation marks and citation omitted); *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir.1999). Plaintiffs' Exchange Act claims sound in fraud, and must therefore satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") in addition to the requirements of Rule 9(b). *See In re Scholastic Corp.*, 252 F.3d 63, 69–70 (2d Cir.2001).

For the reasons that follow, Defendants' motion is granted with respect to Counts II, IV, V, and VI, and is denied in all other respects. In summary, viewing the pleadings in the light most favorable to the Plaintiffs, the CCAC alleges sufficiently that the three studies revealed that Celebrex and Bextra were linked to adverse cardiovascular events to a statistically significant degree, and that these results were known to Defendants. The CCAC also alleges sufficiently that Defendants knew or had access to information showing that their public statements were inaccurate. Given the alleged importance of Celebrex and Bextra to Pfizer's overall economic health, as well as the fall in Pfizer's stock performance, the CCAC's allegations are sufficient to plausibly state a claim under Section 10(b) and Rule 10b–5. The Court also finds that Plaintiffs' 10b–5 allegations are not preempted by the FDCA and do not rely improperly on group pleading. As for the remaining causes of action, Plaintiffs' claims regarding market manipulation are dismissed because Plaintiffs allege nothing more than misrepresentations or omissions. Plaintiffs' control person claims against McKinnell, LaMattina, and Katen are sufficient to state a cause of action because the CCAC alleges adequately a securities violation by Pfizer, control of Pfizer by these defendants, and culpable participation in the fraud. Plaintiffs' claims for insider trading are also stated sufficiently as to these three defendants because the CCAC alleges contemporaneous trades. Plaintiffs' claims for violation of Section 18 are dismissed on statute of limitations grounds. Finally, Plaintiffs' claims for common law fraud and violations of unspecified state securities laws are dismissed for lack of particularity.

## II. Section 10(b) and Rule 10b–5 Claims

■ To state a claim under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff' reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (citation omitted). To survive a motion to dismiss, a plaintiff's scienter allegations must "give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000). "A plaintiff can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001)

(citation and internal quotation marks omitted).

### A. Material Misrepresentations or Omissions

Defendants, citing *In re Carter–Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir.1998) (*"Carter–Wallace I"*) and *In re Carter–Wallace, Inc., Sec. Litig.*, 220 F.3d 36 (2d Cir.2000) (*"Carter–Wallace II"*) (collectively, the *"Carter–Wallace* cases"), contend that they had no duty to disclose the results of the three studies at the core of Plaintiffs' complaint because the results were not statistically significant and thus were immaterial. In the *Carter–Wallace* cases, plaintiffs alleged that Carter–Wallace, the manufacturer of an anti-epileptic medication named Felbatol, was liable for securities fraud because it failed to disclose adverse event reports (e.g., reports by doctors of deaths or other adverse health events) concerning users of the medication. In *Carter–Wallace I*, the Second Circuit found that Carter–Wallace had no duty to disclose reports of scattered adverse events: "Drug companies need not disclose isolated reports of illness suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by—rather than randomly associated with—use of the drugs and are sufficiently serious and frequent to affect future earnings." *Carter–Wallace I*, 150 F.3d at 157. In *Carter–Wallace II*, the Second Circuit held that the lack of statistically significant evidence of Felbatol's adverse effects prior to the company's decision to make disclosure precluded plaintiffs' allegations that the failure to disclose was reckless. *See Carter–Wallace II*, 220 F.3d at 42.

Defendants also rely on *Oran v. Stafford*, 226 F.3d 275 (3d Cir.2000), in which plaintiffs brought a securities class action against American Home Products Corporation ("AHP") and certain of its directors and officers after AHP withdrew its prescription weight-loss drugs Pondimin and Redux from the market in response to reports of serious medical side effects. In affirming the district court's dismissal of the complaint, the Third Circuit held that the undisclosed adverse event reports had not provided sufficiently significant information: "Because the link between the two drugs and heart-valve disorders was never definitively established ..., [the defendant's] failure to disclose this data cannot render its statements about the inconclusiveness of the relationship materially misleading." *Oran*, 226 F.3d at 284; *see also Masters v. Glaxosmithkline*, No. 06–5140–CV, 2008 WL 833085, at *3 (2d Cir. Mar. 26, 2008) (summary order) ("We have held that reports of harmful drug effects are immaterial—and thus need not be disclosed—unless those reports (1) show statistically significant evidence of an adverse effect[;] (2) establish that the adverse effect threatens the 'commercial viability' of the drug; and (3) show that the effect poses a significant risk to the company's future earnings." (citing *Carter–Wallace I* and *Oran* )).

Central to the holdings of the *Carter–Wallace* cases and *Oran* were the lack of statistically significant evidence linking the drugs to adverse health consequences. In the *Carter–Wallace* cases, the evidence at issue regarding the negative effects of Felbatol was limited to six deaths, reported to Carter–Wallace between January and May 1994. On August 1, 1994, after four more deaths had been reported in July, Carter–Wallace disclosed the dangers of the drug. *See Carter–Wallace I*, 150 F.3d at 157 ("In the present case, four of the ten reported deaths occurred in July—the disclosure was on August 1—and the earlier reports are not by themselves sufficient to support inferences of either actual knowledge or recklessness."). Following the same pattern, in *Oran* the evidence of negative effects initially was limited to 24 reports of

heart-valve anomalies, reported to the company by July 1997. However, on September 12, 1997, the FDA informed AHP of a survey showing that 92 of 291 users had developed heart-valve abnormalities. The next day, AHP withdrew the drugs from the market. *Oran*, 226 F.3d at 280. Based on these facts, the Third Circuit concluded that "[t]he withheld reports did not provide such statistically significant evidence. Therefore, we agree with the District Court that the disclosure of the European data and the adverse reaction reports would not have 'significantly altered the "total mix" of information' available to AHP's investors." *Id.* at 284 (citation omitted).

### 1. The Studies' Statistical Significance

Relying on the *Carter–Wallace* cases and *Oran*, Defendants argue that the three studies do not demonstrate statistically significant evidence of adverse cardiovascular events. In support of this argument, Defendants invite the Court to take judicial notice of the meaning of statistical significance, as well as of certain descriptions and discussions of the studies annexed to Defendants' declarations.

The Court declines to take judicial notice of the meaning of statistical significance or of the data interpretations proffered by Defendants in the context of this motion practice. Rule 201 of the Federal Rules of Evidence provides that courts may only take notice of facts "either (1) generally known . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). While statistical significance may have certain characteristics capable of general abstraction, it is far beyond the scope of Rule 201 to accept as fact the particular definitions of statistical significance proffered by Defendants as either facts generally known or as drawn from sources whose accuracy cannot reasonably be questioned.

It is one thing to take notice of the fact that an author has written that 5% is the threshold for statistical significance. It is quite another thing entirely to use that 5% figure as a basis for rejecting the significance of complicated medical studies.

In addition, although Defendants have submitted exhibits that state or suggest that the studies are not statistically significant, those conclusions are not only disputed by Plaintiffs but also appear to be contradicted by other conclusions drawn in the exhibits submitted by the Defendants. In the Clinical Study Synopsis of the Alzheimer's Study, for example, the authors state that "[i]ndividual cardiovascular adverse events did not differ significantly between the celecoxib [Celebrex] and placebo treatment groups." (Markel Dec, Ex. 10 at 6.) However, the report continues: "A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body system terms." (*Id.*) Nevertheless, the proportions of patients experiencing serious adverse events were similar: 22.9% for the placebo group and 25.6% for the group taking Celebrex. (*Id.* at 7.) Other interpretations of the study are equally unhelpful. The FDA wrote that the study "did not demonstrate a significantly increased risk of serious adverse CV events, but did show a trend toward more CV events in the celecoxib treatment arm." (Markel Dec, Ex. 13, at 5.) Dr. Sidney Wolfe wrote that the study reveals a "statistically significant increase in the composite of all serious cardiovascular events in patients getting Celebrex compared to patients getting a placebo." (Markel Dec, Ex. 44 at 1.) Dr. Wolfe stated that the risk of serious cardiovascular adverse events in the Celebrex population was 3.6 times greater than in the placebo population. (*Id.*)

Describing the results of the CLASS Study, the FDA's Medical Officer Review

of Celebrex stated that "[t]here does not appear to be any clinically or statistically significant trend with celecoxib to suggest additional cardiovascular risks over the comparator drugs." (Markel Dec, Ex. 8, at 68.) Nevertheless, the FDA's cardiorenal reviewer, Dr. Doug Throckmorton, concluded that there "seems to be a trend toward more [anginal disorder] events in those patients receiving celecoxib, regardless of aspirin use." (*Id.*) The FDA Medical Officer Review of Celebrex also states that "[i]n the non-aspirin users, there appears to be a slight trend toward more events in those patients receiving celecoxib for combined atrial and anginal disorders; this does not appear to be the case for aspirin users." (*Id.* at 69.) In a subsequent report, the FDA wrote that the results of the CLASS Study revealed "[n]o differences ... for serious adverse CV events between celecoxib and the two non-selective NSAID comparators in this trial." (Markel Dec, Ex. 13 at 5.)

Discussing the first half of the same study, the authors of the JAMA article wrote: "The overall incidence of cardiovascular events, and the incidences of cerebrovascular events and myocardial infarction in particular, were similar in the 2 treatment groups. No treatment-related differences in such events were apparent in the cohort of patients not taking aspirin for cardiovascular prophylaxis." (Markel Dec, Ex. 33, at 1253.) On the other hand, Dr. Wolfe wrote that the data from the CLASS Study "revealed that the rate of combined anginal adverse events was 1.4% in the celecoxib group versus 1.0% in either NSAID group," but conceded this is "a non-statistically significant difference." (Markel Dec, Ex. 32, at 2.) Dr. Wolfe noted that the trend was magnified in those patients not taking low-dose aspirin, where "the celecoxib group had 0.6% vs. 0.2% and 0% in the diclofenac and ibuprofen groups, respectively." (*Id.*) Dr. Wolfe also noted that the CLASS Study data reveals that

the "annualized myocardial infarction rate was statistically significantly higher in the CLASS trial compared to the placebo group from a meta-analysis of other studies evaluating the primary prevention of myocardial infarction with low-dose aspirin. (Placebo 0.52%; CLASS 0.80%, P=0.02)." (*Id.*)

The exhibits discussing the results of the CABG Trial of Bextra are similarly unhelpful. For example, the Final Report of the CABG Trial states that 25.7% (80 out of 311) patients administered Bextra suffered clinically relevant adverse events versus 15.2% (23 out of 151) patients administered a placebo. (Markel Dec, Ex. 1, at 6.) The report concludes that the difference between 25.7% and 15.2% is a "statistically significant difference between treatment groups at p. <0.05." (*Id.* at 5–6.) On the other hand, Defendants assert that the study concludes that the difference between the number of *individual* cardiovascular events in the placebo and Bextra groups was not statistically significant. (*Id.* at 130–31.) In other words, the significance the parties perceive in the report turns on whether the relevant data set of clinically relevant adverse events is to be broken down by sub-group or assessed in the aggregate.

 A motion to dismiss a complaint is not an appropriate vehicle for determination as to the weight of the evidence, expert or otherwise. Clearly, the Court cannot take judicial notice that the three studies show a lack of any statistically significant link between Celebrex/Bextra and adverse cardiovascular events because that supposed fact is neither generally known nor capable of accurate and ready determination by reference to unquestionably accurate sources. Moreover, the Court cannot determine as a matter of law whether such links were statistically insignificant because statistical

significance is a question of fact. *Cf. Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* Nos. Civ. 99–274, Civ. 99–846, 2004 WL 1305849, at *6 (D.Del. June 9, 2004) ("Statistical significance ... is a question of fact for the jury as it is an issue of evidentiary weight."), *vacated in part on other grounds,* 425 F.3d 1366 (Fed.Cir.2005); *Johnston v. Philadelphia,* 863 F.Supp. 231, 236 (E.D.Pa.1994) (holding that significance of statistical trend in hiring practices raised fact question for a jury). Plaintiffs allege that the authors of the Alzheimer's Study themselves concluded that "[a] *statistically significant* difference favoring placebo in adverse events was observed." (CCAC ¶ 94 (emphasis added).) Plaintiffs also allege that the results of the CLASS Study showed certain increases in cardiovascular events in the population taking Celebrex as opposed to the placebo. (*Id.* ¶¶ 93, 105.) Finally, with respect to the CAGB Trial, Plaintiffs allege that an FDA medical officer commented that "[t]he excess of serious cardiovascular thromboembolic [blood clots] in the valdecoxib arm of the CABG trial ... is of note as the entire study population received prophylactic low dose aspirin as part of the standard of care in this setting to minimize just such events." (*Id.* ¶ 111.) Although there are aspects of the studies that could lead a fact finder to discount the significance of their results, such as the relatively small sample sizes and the small percentage increases in cardiovascular events, the Court cannot say at this point that, when the facts are viewed in the light most favorable to Plaintiffs, the studies are statistically insignificant as a matter of law.

The Court's conclusion with respect to statistical significance is further supported by the Second Circuit's explanation that materiality is a flexible, fact-based determination, generally a matter for the finder of fact, and should be decided on a motion to dismiss only when "reasonable minds could not differ" on the importance of the misrepresentation "to a reasonable investor." *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 162 (2d Cir.2000) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)); *Ganino,* 228 F.3d at 164 (rejecting "a bright-line test for materiality"); *Glazer v. Formica Corp.,* 964 F.2d 149, 156 (2d Cir.1992). Although the *Carter–Wallace* and *Oran* decisions stand for the proposition that isolated adverse event reports, lacking statistical significance, do not prove that a drug is unsafe, *Carter–Wallace I,* 150 F.3d at 157; *Oran,* 226 F.3d at 284, the decisions "do not hold that adverse event reports are always immaterial." *In re Bayer AG Sec. Litig.,* 2004 WL 2190357, at *8 (S.D.N.Y. Sept. 30, 2004); *see also In re Elan Corp. Sec. Litig.,* 543 F.Supp.2d 187, 210 (S.D.N.Y. 2008) ("[T]his Court agrees with the *Bayer* court that *Carter–Wallace I* does not establish a bright-line rule for the materiality of information regarding drug safety risks."). The Court notes in this connection that Plaintiffs also allege that, by 2004, Celebrex and Bextra accounted for almost 9% of Pfizer's revenue (CCAC ¶ 71), and that after Bextra had been taken off the market and a black box warning label placed on Celebrex Pfizer's share value fell from a high of $47.44 per share during the Class Period to $21.09 on October 20, 2005, the day after the end of the Class Period. (*Id.* ¶ 150.)

### 2. *Disclosure to the FDA*

 Defendants also contend that, because they disclosed the studies to the FDA, they did not conceal them in violation of any obligations imposed by the securities laws. This argument is also inappropriately fact-based and incorrectly presumes that disclosure to the FDA is equivalent to disclosure to the market. Although it is likely the FDA would highlight or require disclosure of material negative

safety information about a drug, the FDA is not the arbiter of materiality for purposes of the securities laws. Rather, an alleged omission is material if there is a substantial likelihood that the disclosure of the omitted fact would be viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). "The 'total mix' of information includes 'information already in the public domain and facts known or reasonably available to the shareholders.'" *In re Regeneron Pharmaceuticals, Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *14 (S.D.N.Y. Feb. 1, 2005) (quoting *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir.1979)). Disclosure to the FDA does not by itself provide a safe harbor under the securities laws.

The Court also rejects Defendants' related argument that the Food, Drug, and Cosmetic Act ("FDCA") preempts Plaintiffs' claims. Although the degree to which the FDCA preempts products liability claims is an important and still-developing question following the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), the present case does not require the Court to venture into this territory because Plaintiffs are not asserting state product liability claims. Rather, Plaintiffs are asserting misrepresentation and fraud claims arising primarily under federal securities laws— claims that are not preempted by the FDA's approval of Celebrex and Bextra. *Cf. Green v. Fund Asset Management, L.P.*, 245 F.3d 214, 223 n. 7 (3d Cir.2001) ("Unlike the plaintiffs in *Buckman*, the plaintiffs in the case at bar allege not fraud against a federal agency, but rather violations of state and federal securities laws." (citing *Buckman*, at 1016)); *In re Amgen Inc. Sec. Litig.*, 544 F.Supp.2d 1009, 1033 (C.D.Cal.2008) ("The issue be-

fore the Court is not whether the FDA improperly approved [Defendants'] products as safe and effective, but rather whether Defendants violated securities laws by improperly marketing [its drugs] for off-label uses. The FDA has no jurisdiction, primary or otherwise, to decide whether disclosures in the market violate the securities laws.... Consequently, the FDA does not preempt Plaintiffs' claims." (internal quotation marks and citations omitted)).

### 3. Group Pleading

 Defendants challenge Plaintiffs' use of group pleading as well. Normally, "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998) (internal quotation marks and alterations omitted). However, under the group pleading doctrine, a plaintiff may "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 438 (S.D.N.Y.2005) (citation omitted). The group pleading doctrine permits plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotation marks omitted). However, the doctrine is "extremely limited in scope," and "[o]ne such limitation is that it applies only to group-published documents, such as· SEC filings and press releases."

*Goldin Associates, L.L.C, v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2003 WL 22218643, at *5 (S.D.N.Y. Sept. 25, 2003) (citations omitted). Furthermore, the doctrine does not permit plaintiffs to presume the state of mind of the defendants at the time the alleged misstatements were made. *See In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 381 (S.D.N.Y.2004) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made." (citation omitted)).

██ Defendants urge this Court to reject the group pleading doctrine as inapplicable following the passage of the PSLRA. *See Winer Family Trust v. Queen*, 503 F.3d 319, 334–37 (3d Cir.2007); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602–03 (7th Cir.2006), *rev'd on other grounds*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364 (5th Cir.2004). However, the PSLRA does not explicitly abolish the doctrine, and, as Judge Lynch has observed, there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]." *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 641–42 (S.D.N.Y. 2007). Indeed, consistent with the limits of particularized pleading, it is reasonable to assume that the kinds of documents Plaintiffs seek to impute to the Individual Defendants would, in a large company such as Pfizer, not only be the product of a group effort but also be the responsibility of top management such as the Individual Defendants. Moreover, though "[t]he Second Circuit has not addressed this issue, ... the majority of courts in this district

have found that the PSLRA does not abrogate group pleading." *S.E.C. v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 489 n. 101 (S.D.N.Y.2007) (collecting cases); *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 439 n. 42 (S.D.N.Y.2005) (collecting cases). Therefore, this Court joins the others in this district that have held the group pleading doctrine is "alive and well" following the passage of the PSLRA. *In re BISYS Sec. Litig.*, 397 F.Supp.2d at 439.

██ Defendants do not dispute that, if group pleading is allowed, then Plaintiffs' group pleading allegations are properly stated against McKinnell, LaMattina, and Katen. Instead, Defendants contend that Plaintiffs' group pleading is insufficient to support Plaintiffs' claims against Feczko and Cawkwell because they were not involved in the daily management of Pfizer. However, Plaintiffs allege that all of the Individual Defendants—McKinnell, LaMattina, Katen, Feczko, and Cawkwell—made strategic decisions for Pfizer, were directly involved with the day-to-day operations of the company, and that all participated in drafting, reviewing, approving, ratifying, and/or disseminating the company's financial statements and press releases during the Class Period. (CCAC ¶¶ 19, 24, 28, 36, 38.) Given the number and nature of the statements alleged in the complaint (*see* CCAC ¶¶ 170–231), these allegations are sufficient to survive the motion to dismiss.

### B. Scienter

██ Plaintiffs have adequately pled scienter if their allegations "give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000). Scienter can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evi-

dence of conscious misbehavior or recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (citation and internal quotation marks omitted). In *Novak,* the Second Circuit identified four types of allegations that may be sufficient to allege scienter: "[D]efendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak,* 216 F.3d at 311 (citation omitted). In determining "whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences. For an inference of scienter to be strong, a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw." *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007)) (internal quotation marks omitted).

■ Plaintiffs allege that Defendants, including the Individual Defendants, were acutely aware of the studies' negative results. (CCAC ¶¶ 75–82.) In particular, Plaintiffs allege that, according to Dr. John Talley, one of the developers of Celbrex and Bextra, senior managers such as the Individual Defendants were "right on top of the clinical studies related to the drugs." (*Id.* ¶ 76.) Paul Dodson, the former Senior Director of Strategic Planning and Regional operations of Pharmacia— which Pfizer acquired in 2003, along with Pharmacia's interest in Celebrex and Bextra—allegedly reported that decisions on what drugs to bring to market and when to launch them ultimately came "from the top." (*Id.*) According to Plaintiffs, Dodson further stated that information on clinical trial findings would be reported to top

management and would be reported with some specificity where there was "some negative effect or a problem" with the drug. Dodson noted that the cardiovascular safety profile of Celebrex was a big issue with top management and that a Dr. Needleman was responsible for updating top management on significant developments relating to Celebrex and Bextra. (*Id.*) Similarly, Krista Fox, a former Global Marketing Communications Manager at Pharmacia, is alleged to have stated that Pharmacia had a medical information group within the company that "knows the science of a drug inside and out .... Anything that you are going to get out to the public as it relates to sales and marketing efforts has to go through a review committee which usually consists of legal, medical and regulatory and they are experts on the drug and they have to approve everything." (*Id.* ¶ 77.) Finally, Defendant Katen was involved with the two drugs in her capacity as head of the Celebrex and Bextra brand teams. In that position, she was responsible not only for anything promotional about the products, but also for disseminating critical information about the drugs throughout Pfizer. (*Id.* ¶¶ 80– 82.) These passages of the CCAC provide the requisite allegations that all of the Defendants were aware of the studies.

Having established the sufficiency of Plaintiffs' allegations as to materiality as well as the Individual Defendants' knowledge, the question of scienter is implicitly resolved, insofar as the sufficiency of the pleading is concerned, in favor of Plaintiffs' "conscious misbehavior or recklessness" theory. Because Plaintiffs have sufficiently pled that Defendants were aware of multiple studies that linked Celebrex and Bextra to adverse cardiovascular events to a statistically significant degree, the CCAC asserts sufficiently that Defendants "knew facts or had access to information suggesting that their public statements

were not accurate." *Novak*, 216 F.3d at 311; *see also In re Elan Corp. Sec. Litig.*, 2008 WL 839744, at *16 (S.D.N.Y. Mar. 27, 2008) ("Though *Carter–Wallace I* and *Bayer* combined materiality and scienter into a single inquiry, the *Carter–Wallace I* holding has implications for both elements."); *In re Alstom SA*, 406 F.Supp.2d 433, 456 (S.D.N.Y.2005) ("In cases in which scienter is pled in part by alleging that the defendant 'knew facts or had access to information suggesting that their public statements were not accurate,' the scienter analysis is closely aligned with the analysis as to misleading statements." (citation omitted)). Because Plaintiffs have alleged adequately that Defendants were aware of studies containing statistically significant links between Celebrex/Bextra and illness, Plaintiffs have satisfied their burden of alleging facts giving rise to a strong inference of fraudulent intent. No opposing inference is more compelling. Accordingly, Plaintiffs' allegations are sufficient to satisfy their pleading obligation with regard to scienter.

Plaintiffs have thus stated a claim under Section 10(b) and Rule 10b–5. Defendants' motion to dismiss is denied with respect to Count I.

### III. Market Manipulation Claims

 Plaintiffs also assert an alternate theory of liability based on Defendants' alleged use of a manipulative or deceptive device or participation in a scheme to defraud. Subsections (a) and (c) of Rule 10b–5 prohibit the use of "any device, scheme, or artifice to defraud" or participation "in any act, practice, or course of business" that would perpetrate fraud on investors. A plaintiff alleging market manipulation in violation of Rule 10b–5(a) and (c) must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue."

*In re Global Crossing*, 322 F.Supp.2d 319, 329 (S.D.N.Y.2004) (quoting *In re Blech Sec. Litig.*, 961 F.Supp. 569, 580 (S.D.N.Y. 1997)). " 'Manipulation' is 'virtually a term of art when used in connection with securities markets' " and "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

 The Second Circuit has held "that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir.2005) (citing *Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 447–48 (S.D.N.Y.1999)); *accord In re Alstom SA*, 406 F.Supp.2d 433, 475 (S.D.N.Y.2005) ("[I]t is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b–5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations."). Here, because Plaintiffs allege no deceptive course of conduct going beyond misrepresentations or omissions, their market manipulation claims must be dismissed. *See Lentell*, 396 F.3d at 177.

Defendants' motion to dismiss is granted with respect to Count II.

### IV. Control Person Liability

 Plaintiffs assert control person liability claims under Section 20(a) against

McKinnell, LaMattina, and Katen. "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472(2d Cir.1996)). The law in this Circuit is unsettled with respect to whether the PSLRA requires plaintiffs to plead culpable participation under Section 20(a) with heightened particularity. *See In re Global Crossing*, 322 F.Supp.2d 319, 349 n. 24 (S.D.N.Y.2004). This question need not be resolved in connection with the instant motion practice because, even assuming Section 20(a) requires such heightened pleading, Plaintiffs have met the higher standard.

 "[D]etermination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." *Boguslavsky*, 159 F.3d at 720. As demonstrated by the facts discussed above, Plaintiffs state a claim under Section 10(b) and Rule 10b–5 for Pfizer's primary participation in making material misrepresentations and omissions. Plaintiffs have also alleged adequately—and Defendants do not dispute—that McKinnell, LaMattina, and Katen controlled Pfizer by virtue of their key positions with the company. (*See* CCAC ¶¶ 22, 26, 27 (describing defendants' high-level positions); *id.* ¶ 35 (alleging that all of the Individual Defendants controlled Pfizer); *id.* ¶ 38 ("By reason of their positions with the Company, the ... Defendants attended management and/or board of directors meetings, and had access to internal Company documents, reports and other information, including adverse non-public information regarding Pfizer's business, operations, products and future prospects, and including non-public information concerning Celebrex and Bextra.").); *see also In re Check Point Software Technologies Ltd. Sec. Litig.*, No. 03 Civ. 6594, 2006 WL 1116699, at *5 (S.D.N.Y. Apr. 26, 2006); *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 310 (S.D.N.Y.2005).

Finally, Plaintiffs' allegations that McKinnell, LaMattina, and Katen participated directly in the day-to-day management of Pfizer and made strategic decisions is sufficient to meet Plaintiffs' pleading obligation as to culpable participation. *Compare* (CCAC ¶¶ 19, 24, 28 (alleging responsibility for strategic decisions)), *with Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001) ("The complaint alleges that [Defendant] was an officer of the Bank and that he had primary responsibility for the dealings of that Bank .... While somewhat broad, this allegation is sufficient to plead controlling-person liability."). Accordingly, Plaintiffs have pled Section 20(a) liability sufficiently as to McKinnell, LaMattina, and Katen.

Defendants' motion to dismiss is denied with respect to Count HI.

*V. Section 18 Claims*

 Plaintiffs also assert Section 18 claims against McKinnell, LaMattina, and Katen. Section 18 creates a private cause of action against any defendant who makes or causes to be made materially misleading statements in reports or other documents filed pursuant to the Exchange Act, unless that defendant can prove that he or she acted in good faith and without knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78r(a); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n. 31, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Although Plaintiffs concede that they have

failed to bring their claims within the one-year statute of limitations provided in 15 U.S.C. § 78r(c), they argue that the "discovery" two-year statute of limitations period contained in Section 1658(b) of the Sarbanes–Oxley Act governs. *See* 28 U.S.C. § 1658(b). In *In re Alstom SA,* the court held that Section 18 claims are governed by the one-year limitations period contained in 15 U.S.C. § 78r(c). 406 F.Supp.2d 402, 420–21 (S.D.N.Y.2005). *But see In re Adelphia Communications Corp. Sec. and Derivative Litig.,* No. 03 MD 1529, 2005 WL 1679540, at *4 (S.D.N.Y. July 18, 2005) ("Given that § 18 involves more than negligence, this Court finds that the extended two-year/five-year limitations period applies.").

Which limitations period applies turns on the nature of claims brought under Section 18. By its own terms, Section 1658(b) of the Sarbanes–Oxley Act applies only to actions "involv[ing] a claim of fraud, deceit, manipulation, or contrivance." 28 U.S.C. § 1658(b). Because fraudulent intent is not part of a plaintiff's prima facie case under Section 18—indeed, good faith is an affirmative defense—the limitations period prescribed by Section 1658(b) of the Sarbanes–Oxley Act does not trump the provisions of 15 U.S.C. § 78r(c). *See Alstom,* 406 F.Supp.2d at 420–21. Accordingly, because the one-year limitations period of 15 U.S.C. § 78r(c) controls, Plaintiffs' Section 18 claims are time-barred on their face and thus must be dismissed.

Defendants' motion to dismiss is granted with respect to Count VI.

### VI. Insider Trading

Plaintiffs also bring insider trading claims against McKinnell, LaMattina, and Katen under Section 20A. To state a Section 20A claim for insider trading, plaintiffs must allege an insider trading violation by an individual defendant and trading by the plaintiffs contemporaneously with that of the individual defendant. *See* 15 U.S.C. § 78t-1 ("Any person who violates any provision of this chapter ... by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold ... securities of the same class."). Plaintiffs and Defendants agree that Section 20A claims require a predicate securities violation and are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. However, they disagree as to the impact of the contemporaneousness requirement on the viability of Plaintiffs' claim.

While courts have interpreted the contemporaneousness requirement of Section 20A differently, the Court cannot say as a matter of law that trades made within less than week are insufficiently contemporaneous. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 144 (S.D.N.Y.1999) ("Five trading days is a reasonable period between the insider's sale and the plaintiff's purchase to be considered contemporaneous."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 600 (S.D.Tex.2003) ("[T]his Court finds that two or three days, certainly less than a week, constitute a reasonable period to measure the contemporaneity of a defendant's and a plaintiff's trades under § 20A."); *In re Musicmaker.com Sec. Litig.,* No. CV00–2018, 2001 WL 34062431, at *27 (C.D.Cal. June 4, 2001) (observing that the House of Representatives' Report concerning Section 20A suggests that an appropriate time period might be less than a week).

Because Plaintiffs have alleged trades within five days of trades by defen-

dants Katen and LaMattina, and within six days of trading by McKinnell, (*see* CCAC, Ex. A (showing that Lead Plaintiff TRSL traded on March 2, 2004, within five days—note that 2004 was a leap year—of LaMattina's and Katen's trades of February 26, 2004, and within six days of McKinneU's February 25, 2004 trades)), Plaintiffs' Section 20A claims are sufficiently pled.

Defendants' motion to dismiss is denied with respect to Count VII.

*VII. State Claims*

Finally, Lead Plaintiff TRSL and a subclass allege that Defendants committed common law fraud and violated unspecified state securities laws.

*A. Common Law Fraud*

■ The elements of common law fraud under New York law are "essentially the same" as those required to state a claim under Section 10(b) and Rule 10b–5. *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 425–26 (S.D.N.Y. 2000), *abrogated on other grounds, In re IPO Sec. Litig.*, 241 F.Supp.2d 281, 352 n. 85 (S.D.N.Y.2003). Defendants contend that Plaintiffs have failed to properly plead reliance because the fraud-on-the-market theory cannot be used to satisfy the reliance requirement of a common law fraud claim under New York law. There is an "open question" in this Circuit as to whether the fraud-on-the-market theory can be used in this way, *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 142 (2d Cir.2001), although the Second Circuit has observed that "federal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context." *Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir.2000).

Federal and state courts outside of New York have generally rejected use of the fraud-on-the-market theory when evaluating common law securities fraud claims. *See, e.g., Peil v. Speiser*, 806 F.2d 1154, 1163 n. 17 (3d Cir.1986) ("While the fraud on the market theory is good law with respect to the Securities Acts, no state courts have adopted the theory, and thus direct reliance remains a requirement of a common law securities fraud claim." (citation omitted)); *see also Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del.1992) ("A class action may not be maintained in a purely common law ... fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact."); *Antonson v. Robertson*, 141 F.R.D. 501, 508 (D.Kan.1991) ("[W]ith respect to plaintiffs' common law fraud claims, in the absence of an analogous state law doctrine of fraud on the market, each individual plaintiff would be required to prove his or her individual reliance, causing individual questions of fact to predominate in the case."). Indeed, in one of the most extensive opinions on the subject, the Supreme Court of California rejected the use of the fraud-on-the-market theory in common law fraud claims, concluding in part that permitting use of the theory in the broad realm of common law fraud—which, for example, requires no purchase or sale of securities—could invite "exceedingly speculative" fraud theories and would be unnecessarily duplicative of federal and state statutory law. *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1097–1108, 23 Cal.Rptr.2d 101, 858 P.2d 568 (Cal.1993). "In summary, to incorporate the fraud-on-the-market doctrine into the common law of deceit would only bring about difficulties that the state Legislature and the federal courts have apparently attempted to avoid..... Under these circumstances, there is insuf-

ficient justification for upsetting the policy choices that the existing laws reflect." *Id.* at 1108, 23 Cal.Rptr.2d 101, 858 P.2d 568.

■ Faced with the question, courts in this district have generally refused to allow plaintiffs to use the fraud-on-the-market theory to support common law fraud claims. *See Hunt v. Enzo Biochem, Inc.,* 530 F.Supp.2d 580, 598–99 n. 138 (S.D.N.Y. 2008) (citing *In re Marsh & Mclennan Cos., Inc.,* 501 F.Supp.2d 452, 495 (S.D.N.Y.2006); *Feinberg v. Katz,* No. 01 Civ. 2739, 2007 WL 4562930, at *6 (S.D.N.Y. Dec. 21, 2007)); *cf. In re Blech Sec. Litig.,* 961 F.Supp. 569, 587 (S.D.N.Y. 1997) (holding that while the fraud-on-the-market theory is not available for common law fraud claims based upon misrepresentations or omissions, the theory is available for fraud claims based upon market manipulation). *But see Minpeco S.A. v. Hunt,* 718 F.Supp. 168, 176 (S.D.N.Y.1989); *see also Ackerman v. Price Waterhouse,* 252 A.D.2d 179, 683 N.Y.S.2d 179, 191–92 (App. Div. 1st Dep't 1998). In *Basic Inc. v. Levinson,* the Supreme Court distinguished "common-law deceit and misrepresentation claims" from Rule 10b–5 claims, noting that the latter "are in part designed to *add* to the protections provided investors by the common law." 485 U.S. 224, 244 n. 22, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (emphasis added). By sanctioning the use of the fraud-on-the-market theory in *Basic,* the Supreme Court increased the availability of a presumption of reliance in securities claims brought under federal law; securities claims brought pursuant to common law, however, were unchanged. Because New York has not yet recognized the fraud-on-the-market theory and continues to require that fraud claims allege reliance and be stated in detail, *Vermeer Owners, Inc. v. Guterman,* 78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378–79 (1991), the Court concludes that the fraud-on-the-market theory is unavailable to Lead Plaintiff TRSL and the subclass. Here, Plaintiffs have only included general allegations of direct reliance. (CCAC ¶¶ 331, 337–38.) Their pleadings are thus insufficient and Plaintiffs' common law fraud claims must be dismissed. *Cf. Hunt,* 530 F.Supp.2d at 599 (holding that plaintiffs' allegations of direct reliance on statements made at a presentation plaintiffs attended sufficed to plead direct reliance with particularity).

### B. Violations of State Securities Laws

■ The claims of Lead Plaintiff TRSL and the subclass for violations of "those state securities laws that have a private right of action of each of the states in which the members of the subclass are located," (CCAC ¶ 335), must also satisfy the particularity requirements of Rule 9(b). In *Chrysler Capital Corp. v. Century Power Corp.,* the court dismissed plaintiffs' claims for violations of unspecified "Applicable State Securities Laws" because Rule 9(b) "requires Plaintiffs to indicate the state statutes under which they seek relief." 778 F.Supp. 1260, 1270 (S.D.N.Y.1991). Because the CCAC similarly fails to identify the state securities laws that were allegedly violated, the claims must be dismissed. While the Court will allow Plaintiffs to re-plead their state law claims pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, it observes that the CCAC's use of subclassing and contemplated application of numerous state laws may create intractable choice-of-law, commonality, manageability, and superiority problems at the class certification stage. *See, e.g., Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1300 (7th Cir.1995) (rejecting lower court's attempt to blend the negligence laws of numerous jurisdictions into a single "Esperanto instruction"); *see also* Sue–Yun Ahn,

CAFA, Choice–of–Law, and the Problem of Legal Maturity in Nationwide Class Actions, 76 U. Cin. L.Rev. 105, 110–11 (2007) ("But while subclassing among the plaintiff class by states with similar laws has been suggested in some circumstances, subclassing is often seen as detrimental to the manageability of the class under Rule 23(b)(3)'s superiority requirement." (citations omitted)).

Defendants' motion to dismiss is granted with respect to Counts IV and V.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss (docket entry # 56) is granted as to Counts II, IV, V, and VI, with leave to re-plead all Counts except for Count VI, and is denied in all other respects. Plaintiffs' motion to strike (docket entry # 68) is denied as moot. The Clerk of Court is respectfully requested to terminate Docket Entry Nos. 56 and 68. Any amended consolidated class action complaint must be filed and served by July 21, 2008, with a courtesy copy provided for chambers, and Defendants' response must be served and filed, with a courtesy copy provided for chambers, by August 4, 2008. An order scheduling a pretrial conference will be issued.

SO ORDERED.