**CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM,** Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

**LOCKHEED MARTIN CORPORATION,** Robert Stevens, Bruce Tanner, and Linda Goo Den, Defendants.

No. 11 Civ. 5026 (JSR).

United States District Court, S.D. New York.

July 13, 2012.

361

Evan Jay Kaufman, Samuel Howard Rudman, Mark Samuel Reich, Michael Gerard Capeci, Robbins Geller Rudman & Dowd LLP, Melville, NY, Darryl J. Alvarado, Jonah H. Goldstein, Patrick Joseph Coughlin, Theodore J. Pintar, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Randi Dawn Bandman, Robbins Geller Rudman & Dowd LLP, Los Angeles, CA, Robert R. Henssler, Jr., Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiff.

John Michael Hillebrecht, DLA Piper U.S. LLP, New York, NY, James E. Anklam, James D. Wareham, DLA Piper U.S. LLP, Washington, DC, for Defendants.

## MEMORANDUM

JED S. RAKOFF, District Judge.

Plaintiff City of Pontiac General Employees' Retirement System (the "Retirement System") brings this securities class action suit on behalf of purchasers of the common stock of defendant Lockheed Martin Corp. between April 21, 2009 and July 21, 2009 (the "Class Period") alleging that defendant Lockheed Martin Corp. and three of its executives, Chief Executive Officer Robert Stevens, Chief Financial Officer Bruce Tanner, and Executive Vice President Linda Gooden, intentionally made false and misleading statements about the performance of Lockheed Martin's Information Systems & Global Systems division ("IS & GS"), and failed to disclose that there were serious problems with the performance and growth of the division. Count I of the Amended Complaint asserts a claim of securities fraud against all four defendants, pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Counts II and III of the Amended Complaint assert claims of control person liability against the individual defendants, pursuant to Sections 20(a) and 20(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)-(b).

Defendants jointly and severally moved to dismiss all counts. After full consideration of the parties' written submissions and oral arguments, the Court, by "bottom-line" Order dated February 15, 2012, dismissed Counts II and III, but denied defendants' motion to dismiss Count I. This Memorandum sets forth the reasons for those rulings.

The pertinent factual allegations, drawn from plaintiff's Amended Complaint, are as follows. On April 21, 2009, Lockheed Martin issued a press release announcing its financial results for the first quarter of 2009 ("Q1"). Am. Compl. ¶ 67. The release reported the Q1 results for IS & GS and for Lockheed Martin as a whole. It showed increases in net sales and operating profit for IS & GS compared to Q1 2008, but a decline in operating margins. The release also reported an increase in Lockheed Martin's firm-wide 2009 financial projections for earnings before "income taxes" of $5 million and an increased projection of diluted earnings per share from a range of $7.05–$7.25 per share to $7.15–$7.35 per share. *Id.*

Defendant Stevens commented on the results, stating:

> The Corporation is off to a solid start in the first quarter of 2009. Our team of 146,000 dedicated employees continues to focus on enhancing shareholder and customer value by utilizing the depth and breadth of our capabilities as the world's premier global security company.

*Id.*

Plaintiff argues that these statements were materially false and misleading, first, because Lockheed Martin had overstated its projections for IS & GS, and, second, because Lockheed Martin had failed to disclose numerous material adverse facts regarding IS & GS that the defendants knew or recklessly disregarded. *Id.* ¶ 68.

The latter included that: (1) IS & GS had submitted "lowball" bids to win contracts at the expense of margin and profits; (2) there were performance problems with major IS & GS projects during the Class Period; and (3) because of these performance issues, Lockheed Martin would not be receiving anticipated fee awards. *Id.*[1]

The same day that Lockheed Martin issued the press release, defendant Tanner held a conference call with analysts and investors, during which he made the following positive statements about the IS & GS division:

> I now want to turn to *our fastest growing business,* our Information Systems & Global Services. The IS & GS team continues to lead the corporation in top line sales growth again this quarter. *The new business win rate of IS & GS differentiates them from competitors and enabled expansion of their revenues by 10% above last year's level.* Key awards this quarter included a contract from the U.S. Special Operations Command to provide full scope logistic support to Special Operations troops around the globe. This 10 year IDIQ contract has a potential value of up to $5 billion. Although this award has been placed under protest by a competitor, we look forward to successful protest resolutions to work and proceed and enable us to provide critical logistic support to this key customer. Other IS & GS wins include a $400 million award by the General Services Administration

**1.** Plaintiff alleges that, in addition to reviewing public and proprietary sources of information, plaintiff's counsel obtained information from six confidential witnesses ("CWs"), former employees of Lockheed Martin who were employed during the Class Period and who provided facts concerning the IS & GS division. Am. Compl. ¶ 22. The Amended Complaint sufficiently details the precise title and job duties of each of the CWs, as well as

their respective contacts with defendant Gooden, "to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000); *accord New Orleans Emps. Retirement Sys. v. Celestica, Inc.,* 455 Fed.Appx. 10, 13–14 (2d Cir.2011) (summary order) (noting a plaintiff may rely on confidential witnesses to adequately plead securities fraud claims).

to provide systems support to the Federal acquisition service. *These wins add to IS & GS's solid backlog and we expect this to continue generating the highest revenue growth of all of our business areas this year.* Before leaving IS & GS, I wanted to reiterate our press release disclosure earlier today announcing the realignment of IS & GS's three lines of business effective January 1st. This realignment to civil, defense and intelligence, better aligns the segment based on its core customers and business activities. Current quarter and historical financial results have been realigned to provide comparative financial data.

*Id.* ¶ 71 (emphasis in original). The Amended Complaint alleges that that these statements were materially false and misleading. *Id.* ¶ 72. It alleges that Tanner's comments describing IS & GS as Lockheed's "fastest growing business" and its "business win rate" failed to disclose that IS & GS had grown by underbidding for contracts, which was not a sustainable path to long-term growth. *Id.* It further alleges that Tanner's comment regarding IS & GS's "solid backlog" was false, as defendants knew that defendant Gooden had artificially inflated the IS & GS backlog. *Id.*

On the conference call, Tanner also fielded several questions from financial analysts, and allegedly made materially misleading statements concerning performance issues in IS & GS and expectations of future growth. Among other things, Tanner, in response to an analyst's question specifically inquiring about "Red" (*i.e.*, troubled) programs, failed to disclose that several IS & GS programs had "Red" classifications for performance issues. *See id.* ¶¶ 73–78.[2]

Two days later, on April 23, 2009, Lockheed Martin filed its 10–Q quarterly report with the Securities and Exchange Commission. *Id.* ¶ 79. This 10–Q stated, in pertinent part:

Operating profit for IS & GS increased by 5% for the first quarter of 2009 compared to the first quarter of 2008. Operating profit increases in Defense partially were offset by declines in Civil. The increase in Defense mainly was due to volume and improved performance in mission and combat systems, as well as readiness and stability operations. The decrease in Civil primarily was attributable to the absence in 2009 of a benefit recognized in 2008 for a contract restructuring.

*Id.* Plaintiff alleges this 10–Q was likewise false and misleading for failing to disclose the problems in IS & GS discussed above. *Id.* ¶ 80.

A little over a month later, on May 28, 2009, defendant Stevens appeared at a conference to discuss Lockheed Martin and its business. At the conference, he stated that he expected IS & GS would

**2.** In this regard, the Amended Complaint further alleges that:

Lockheed Martin utilized a stoplight color coding system to label the performance of its projects. The color codes consisted of "Red," "Yellow" and "Green" and the classifications were based on a number of categories, including how a project was performing according to costs, scheduling, customer relationships, and subcontractor relationships.... [T]he ratings for projects were based on objective criteria, the project rating status was established by the main Lockheed Martin headquarters, and every IS & GS project was evaluated on a monthly basis. The project evaluations were conducted by the program managers for each project and the stoplight status was loaded into a "dashboard" system that was hosted on Lockheed Martin's intranet. CW1 stated that Defendant Gooden reported the status of IS & GS projects to Lockheed Martin's other senior executives.

Am. Compl. ¶ 44.

"meet and honor [its] commitment" to double-digit growth for the year. *Id.* ¶ 82. Defendant Stevens also described how IS & GS was staffed with "individuals who are intimately familiar with complex systems infrastructure," without disclosing, according to the Amended Complaint, that IS & GS had terminated many highly qualified individuals and was instead left with low-paid, inexperienced employees working on projects. *Id.* ¶¶ 39, 83.

On July 21, 2009, Lockheed issued its earnings results for the second quarter of 2009 ("Q2"), which, for IS & GS, were below expectations. Operating profit in IS & GS decreased by 9% for the quarter, *id.* ¶ 84, which defendant Stevens stated was due to "performance challenges" in IS & GS. *Id.* Following the press release, Lockheed held an earnings conference call, and revised IS & GS sales projections for 2009 from $12.5–$12.75 billion to $12.4–$12.65 billion; IS & GS operating profit projections from $1.17–$1.195 billion to $1.035–$1.06 billion; and company-wide operating profit projections from $5.175–$5.275 billion to $5.075–$5.175 billion. *Id.* ¶ 86. During the conference call, defendant Tanner stated that "protests by losing competitors" had hurt IS & GS's sales rate, *id.* ¶ 87, and that he recognized that by May or June IS & GS was going to earn lower award fees for the quarter, *id.* ¶¶ 88–89.

On the day (July 21, 2009) those revisions to Lockheed's financial results and disclosures concerning IS & GS were made, the price of Lockheed Martin common stock declined from $82.11 per share on July 20, 2009 to $75.13 per share on July 21, 2009, on extremely heavy trading volume. *Id.* ¶ 92. According to the Amended Complaint, analysts expressed surprise at the sudden negative news regarding IS & GS, with one report stating, "The sell-off in [Lockheed Martin] shares may reflect a heightened level of investor frustration regarding IS & GS since the company had recently pointed to this area of the business as a potential source of outperformance relative to the industry." *Id.* ¶ 93; *see also id.* ¶ 94 (alleging IS & GS "continued its decline after the end of the Class Period").

In the face of these allegations, defendants moved to dismiss all three Counts of the Amended Complaint for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). On a motion to dismiss, the Court accepts all of a plaintiff's factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 128 (2d Cir.2011). To survive a motion to dismiss, however, a plaintiff must allege facts, as opposed to conclusory allegations, sufficient "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). Additionally, under Rule 9(b), Fed.R.Civ.P., and section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737, *codified at* 15 U.S.C. § 78u–4(b)(1) claims of securities fraud are subject to heightened pleading requirements. *ATSI Commc'ns v. Shaar Fund Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). Among other things, Rule 9(b) requires that a plaintiff must state with particularity: (1) the statements that are allegedly fraudulent; (2) the identity of the speaker; (3) when and where the particular statements were made; and (4) why the statements were fraudulent. *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004); *see also* 15 U.S.C. § 78u–4(b)(1) (similar requirements under PSLRA for § 10(b) claims).

Turning first to Count I, defendants argue that plaintiff's claim of securities fraud fails to allege a plausible claim for three reasons: (1) the statements plaintiff identi-

fies are not actionably false or misleading statements; (2) plaintiff fails to adequately allege scienter on the part of either the individual defendants or Lockheed Martin; and (3) as to defendant Gooden, none of the alleged misstatements is directly attributable to her, and the plaintiff cannot rely on the so-called "group pleading" doctrine to tie her to the statements made by Lockheed Martin. The Court rejects each of these arguments.

■ Defendants' first argument is that the statements plaintiff have alleged to be false or misleading—many of which are projections of future results—are not actionable because they are forward-looking statements accompanied by cautionary language that are protected by the PSLRA's "safe harbor," 15 U.S.C. § 78u–5(c), and by the parallel judicially-created "bespeaks caution" doctrine from which the PSLRA's safe harbor derived. *See Rombach,* 355 F.3d at 173. Under the PSLRA, forward-looking statements are not actionable, even if plaintiff has alleged that the statement was made with actual knowledge of its falsity (*see infra*), if the statement "is identified as forward-looking, and is accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u–5(c). Similarly, under the bespeaks caution doctrine, "a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 359 (2d Cir.2002).

■ Here, defendants argue that by stating "Actual results may differ materially from those projected" in the Q1 press release, followed by directing the reader to a "non-exclusive list of fifteen specific risk factors," they provided meaningful sub-

stantive cautionary statements. *See* Declaration of John M. Hillebrecht in Support of Lockheed Martin Corporation's Motion to Dismiss the Amended Complaint dated Dec. 7, 2011 ("Hillebrecht Decl.") Ex. A. For example, the press release lists "difficulties in developing and producing operationally advanced technology systems" as a specific risk factor. *Id.* Defendants argue that the specific problems plaintiff asserts caused the disappointing results—like bid protests and low backlog—are listed in these factors, and that investors were therefore on notice of the risks. *See, e.g., Cross Media Mktg. Corp. Sec. Litig.,* 314 F.Supp.2d 256, 267 (S.D.N.Y.2004) (specific warning about risks due to government regulation of telemarketing sufficient to invoke safe harbor).

It is clear, however, that some of the statements plaintiff alleges were false or misleading, such as the statements concerning the IS & GS backlog, were not forward-looking statements. Moreover, a fair reading of the disclaimers in the press release shows that they are largely generalized boilerplate, not "meaningful" cautionary language that speaks to the substantive information that plaintiff alleges the defendants misrepresented. *See Slayton v. Am. Express Co.,* 604 F.3d 758, 770 (2d Cir.2010) (holding cautionary language that is misleading in light of historical fact cannot be meaningful); *id.* at 772 (boilerplate language insufficient; language must convey substantive information); *In re Merrill Lynch Auction Rate Sec. Litig.,* No. 09 Civ. 9697(LAP), 2011 WL 1330847, at *8 (S.D.N.Y. Mar. 30, 2011) (party may not rely on generic disclaimer where it is aware of actual danger or "cause for concern"). Overall, indeed, the situation is not unlike that described in *New Orleans Emps. Retirement Sys. v. Celestica, Inc.,* 455 Fed.Appx. 10 (2d Cir.2011) (summary order), where the Second Circuit stated:

Although some of defendants' statements were forward-looking, others reported on past or present circumstances. Specifically, defendants are alleged to have represented repeatedly that the restructuring was going according to plan or, if not, was slowed because of problems unrelated to inventory management. Moreover, when asked directly about the company's inventory levels, defendants responded either that Celestica was managing its inventory well or that any inventory problems were aberrations. In sum, defendants "did more than just offer rosy predictions"; they allegedly stated that present inventory was under control or omitted it as a contributor to the company's costs, despite recklessly disregarding that the opposite was true. *Novak v. Kasaks,* 216 F.3d [300,] 315 [ (2d Cir.2000) ]. Thus, defendants' [sic] cannot obtain dismissal under the PSLRA safe harbor. *Id.* at 15 (internal citations omitted). Taking the particularized allegations of the Amended Complaint as true, defendants here went well beyond mere "rosy predictions"—they affirmatively (and, according to the Amended Complaint, falsely) stated that IS & GS was doing well, had no performance issues, had a "solid backlog," and had a strong "win rate" driving its performance. These allegedly false statements were neither themselves forward-looking nor provided a basis for forward-looking projections that could be disclaimed except by far more specific descriptions of the relevant risks than any provided by defendants at the time.

Similarly, the Court rejects defendants' argument that their optimistic statements about future growth were "mere puffery" and thus not actionable. *See SRM Global Fund Ltd. v. Countrywide Fin. Corp.,* No. 09 Civ. 5064(RMB), 2010 WL 2473595, at *11–12 (S.D.N.Y. June 17, 2010), *aff'd* 448 Fed.Appx. 116, 118 (2d Cir.2011) (summary order) ("[O]ptimistic statements about future profitability constitute nonactionable forward-looking statements."). Rather, the projections that plaintiff alleges were false were, in many instances, highly specific. For example, plaintiff alleges that the statement that IS & GS's "win rate" drove growth was false and misleading, as it failed to disclose the alleged underbidding scheme, Am. Compl. ¶¶ 71–72. Similarly, plaintiff alleges that defendant Tanner's stating that he did not "see anything that would cause us to back off [the] assumption" that IS & GS would meet its projections was false and misleading because Tanner allegedly knew that IS & GS projections were overstated and that there were performance problems with multiple IS & GS projects. *Id.* ¶¶ 75–76, 78; *see In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir.1998) (holding that opinions or projections are actionable if supported by "specific statements of fact," or if "the speaker does not genuinely or reasonably believe them").

Defendants themselves concede that at least two of the statements alleged to be false or misleading are not "forward-looking" statements or mere "puffery," to wit, Tanner's statements on the Analyst Call that there were no "performance issues," Am. Compl. ¶ 73, and that there were not "really [any] hiccups or pop-outs from a performance perspective," Am. Compl. ¶ 77. Defendants argue, however, that these two statements were neither false nor misleading. Specifically, as to the statement that there were no "performance issues," defendants argue that, read in context, the statement relates not to any and all "performance issues," but rather to only "performance write offs" that would have affected Lockheed's margins in its financial statements in the preceding quarter. Lockheed Martin Corporation's Memorandum of Law in Support of Its

Motion to Dismiss the Amended Complaint dated Dec. 7, 2011 ("Lockheed Br.") at 8–9. And as to the statement that there were no "hiccups or pop-outs from a performance perspective, defendants argue that even if Tanner knew during the call that IS & GS programs were in the Red, that did not make his vague reference to the absence of "hiccups or pop-outs" untrue. *Id.* at 9. Moreover, defendants argue that plaintiff fails to plead specifically the date that each program was placed into "Red" status, and instead asks the Court to assume that all programs became "Red" before Tanner made the statement on April 21, 2009. *See* Am. Compl. ¶¶ 45, 48, 49. According to defendants, plaintiff simply makes vague allegations that defendant Gooden attended "meetings" (undated) where she received status updates and reported such updates to "other senior executives." Without specificity, defendants argue, this pleading fails to show falsity.

The Court disagrees. Plaintiff has alleged sufficient facts plausibly showing the falsity of each of these two statements. First, the "performance issue" statement was in response to a question about why IS & GS's margins had dipped below 9% for the first time since 2006. Am. Compl. ¶ 73. Plaintiff alleges that, instead of disclosing the performance issues in IS & GS, Tanner blamed the decline on "strictly the timing of . . . cost of sales recognition," and said "[t]here were no performance issues." *Id.* Plaintiff alleges that the attribution of the decline in margins to an accounting issue was false because defendants knew or recklessly disregarded that there were performance issues in IS & GS that would affect IS & GS margins, including programs being designated "Red." *Id.* ¶ 74. On its face, nothing in the Amended Complaint on this issue appears to be taken out of context.

The "no hiccups" statement made by Tanner is also plausibly alleged to be false. Plaintiff argues that Tanner alluded to troubled programs in other divisions of Lockheed Martin, but attempted to minimize any perception that the company's fastest growing division was experiencing serious performance-related problems, which had many projects in the Red. *Id.* at 13. The Amended Complaint notes that during the July 21, 2009 conference call held after defendants disclosed the problems in IS & GS, an analyst stated:

> Last quarter you were asked about where you see red programs. I realize you guys have thousands of programs but your answer to that question alluded to some things in space and to some things in ES and you didn't even touch on IS & GS. So how was it that this was kind of not on the radar screen and really snuck up on you?

Am. Compl. ¶ 91 (internal quotation marks omitted). This plausibly suggests that the participants on the original call thought Tanner was referring to all performance issues (other than those he specifically addressed, *e.g.*, "space" and "ES"), not just the technical accounting issue defendants point to.

As for timing, defendants are correct that the Complaint does not specifically allege when Gooden spoke with Stevens and Tanner about IS & GS, and merely alleges that Stevens and Tanner received their information about IS & GS from Gooden. But the Amended Complaint specifies the dates at which Gooden received the information, listing January 2009, February 2009, and March 2009 as dates when the alleged misconduct occurred. *See, e.g.*, Am. Compl. ¶¶ 35, 36, 50, 51, 65. Considering this conduct related to Lockheed Martin's quarterly earnings, it is plausible to infer that when the Complaint alleges that the defendants received

their information about IS & GS from Gooden, they received the relevant information before Lockheed Martin issued its quarterly earnings report. There are sufficient particularized allegations to survive a motion to dismiss.

Finally, as to all the statements alleged to be false or misleading, defendants argue that the statements are not plausibly alleged to be false or *"misleading* as to a *material* fact." *Matrixx Initiatives, Inc. v. Siracusano,* — U.S. —, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398 (2011) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)) (emphasis in original); *see* 17 C.F.R. § 240.10b–5(b). Specifically, defendants argue that even if the statements alleged were otherwise actionable, statements regarding IS & GS, just one division of Lockheed Martin, fail to satisfy the materiality requirement, as they do not significantly alter the "total mix" of information such that a reasonable investor would consider them "important."

■ The materiality requirement for a section 10(b) claim is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx,* 131 S.Ct. at 1318 (internal citations and quotation marks omitted). However, the SEC bulletin interpreting "materiality" under Rule 10b–5, suggests that there exists a preliminary assumption, or "rule of thumb," that changes of less than 5% to financial statements are immaterial, although there are various "qualitative factors" that could make even a small change material. *See* SEC, Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (Aug. 12, 1999). Moreover, the Second Circuit considers the SEC's bulletin on materiality "persuasive authority." *See ECA v. JP*

*Morgan Chase Co.,* 553 F.3d 187, 197–98 (2d Cir.2009) (citing SEC, Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (Aug. 12, 1999)).

■ Here, following the disclosures about IS & GS, Lockheed Martin's overall projected profit decreased just 2.7%. Defendants argue that plaintiff has not alleged "qualitative factors" sufficient to overcome this presumption, and thus plaintiff has failed to allege materiality. The Court, however, disagrees.

To begin with, materiality is generally a mixed question of law and fact and is rarely a basis for dismissal on the pleadings unless the alleged misstatement is "obviously unimportant to a reasonable investor." *ECA,* 553 F.3d at 197–98 (noting SEC bulletin "does not change the standard of materiality" and that materiality is a "fact-specific inquiry"). Indeed, even the SEC Bulletin notes that the 5% threshold is merely a "rule of thumb," and that "materiality cannot be reduced to a numerical formula." Staff Accounting Bulletin No. 99; *see also Matrixx,* 131 S.Ct. at 1318, 1321 (rejecting focusing on "a single fact" in favor of "contextual" analysis).

In terms of qualitative factors, moreover, the Amended Complaint alleges that IS & GS was Lockheed Martin's "fastest growing business," Am. Comp. ¶ 71, that IS & GS was a key part of Lockheed Martin's future growth plans, *id.* ¶¶ 32–33, that the change in projected operating profit for IS & GS was a decrease of 11–12%, *id.* ¶ 86, that analysts were clearly surprised and disappointed after the misstatements were corrected, *id.* ¶¶ 89, 91, 93, and that the share price declined by almost 10% after the announcement, *id.* ¶ 92 (from $82.11/share to $75.13/share). Given these allegations, the Court cannot conclude, as a matter of law, that the statements about IS & GS were immaterial. *See also Litwin v. Blackstone Group,*

*L.P.*, 634 F.3d 706, 720 (2d Cir.2011) (concluding that misstatement may be material as to "a particularly important segment" of company's business, even if small relative to overall firm); *Celestica*, 455 Fed.Appx. at 15–16 (refusing to dismiss on materiality even where alleged misstatements were "minuscule in comparison to [defendant's] global assets and annual revenues," as distortion was significant to analyst estimates, company's restructuring efforts, and "precipitous" decline in share price after disclosure).

Defendants' second overall argument for dismissal is that the Amended Complaint fails to adequately allege scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). To adequately allege scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). The allegations must support a strong inference that the defendants, at the very least, acted with "reckless disregard for the truth." *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir.2009). Reckless disregard means conduct that "is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000)).

The requisite strong inference of scienter may be established only by alleging particularized facts showing either: (1) both motive and opportunity on the part of the defendant to commit the fraud; or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). Under the PSLRA, for an inference of scienter to be sufficiently "strong," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In other words, the Court must balance reasonable inferences favoring the plaintiff against those favoring the defendant. Here, plaintiff concedes it has not alleged motive by the defendants, and thus must instead allege "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.

■ Since the intent of an executive who acted with scienter can be imputed to the company, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.2008), the Court examines this issue by looking at the adequacy of the allegations of scienter as to each of the three individual defendants:

■ *With respect to defendant Gooden,* Executive VP of IS & GS, the Amended Complaint alleges, based on interviews with multiple confidential witnesses, that Gooden knew the public representations made by Lockheed Martin about IS & GS were false. Specifically, the Amended Complaint alleges that, in or around February 2009, three confidential witnesses who were executives in IS & GS told Gooden that the financial goals for IS & GS for 2009 were overstated and could not be achieved. Am. Compl. ¶¶ 35–36.

The Amended Complaint further alleges that Gooden caused many of the financial problems in IS & GS through a practice of submitting "lowball" bids for contracts in an effort to close contracts, despite knowing that Lockheed Martin could not perform the work it bid on without large cost overruns. *Id.* ¶ 38 ("According to CW3,

Defendant Gooden and members of her staff personally reviewed each bid submitted by IS & GS and it was their regular practice to revise the bids downward."); ¶ 39 ("CW4 stated that Defendant Gooden ... [was] directly responsible for the strategy of underbidding in programs."). Additionally, according to CW4, IS & GS focused on cash flow instead of profitability. *Id.* ¶ 39. Moreover, CW4 stated that IS & GS deliberately understated the cost of labor required for programs and fired employees to reduce labor costs, replacing them with inexperienced workers, which resulted in execution problems. *Id.*; *see also id.* ¶ 43.

As to specific performance issues, the Amended Complaint alleges that Lockheed Martin held weekly telephone conference calls, referred to "Red Program Review Meetings," during which each IS & GS program classified as "Red" was discussed. *Id.* ¶ 45. Defendant Gooden and IS & GS program managers regularly participated on these weekly calls. *Id.* According to CW3, it was clear from the calls that major Civil Segment IS & GS programs were troubled in April and May 2009. *Id.* CW3 also stated that there were at least five major IS & GS Civil Segment projects in Red status in the months leading up to July 2009, and CW3 was not aware of any programs that unexpectedly entered Red status in June or July 2009. *Id.*; *see also id.* ¶¶ 46–50 (discussing specific Red programs); *id.* ¶¶ 51–52 (discussing problems with other IS & GS programs). The Amended Complaint alleges that the main corporate office of Lockheed Martin began "closely monitoring" troubled IS & GS programs as early as 2007. *Id.* ¶ 53. According to CW2, there were monthly corporate review meetings where the status

of these troubled programs was discussed, including the impact they would have on quarterly and year-end financial results. *Id.*

Finally, the Complaint alleges that in March 2009, Gooden approached CW2 and pressured CW2 to represent that the IS & GS area for which CW2 was responsible had a $2.5 billion backlog for 2009. *Id.* ¶ 65.[3] CW2 allegedly told Gooden and others with whom she worked that $2.5 billion in backlog was not reasonable. *Id.* Nevertheless, Gooden, with the assistance of others, allegedly ignored CW2 and changed the backlog figures, grossly overstating the actual backlog. *Id.*

Defendants nonetheless argue that these allegations are insufficient to show scienter as to defendant Gooden for three reasons. First, the statements by the confidential witnesses were "equivocal" and about issues that were under debate, not objective fact. *See, e.g., id.* ¶ 36 (CW3 claimed that there was "a great deal of discussion ... leading up to July 2009 that IS & GS *may* underperform") (emphasis supplied). Second, defendants argue that the Amended Complaint does not allege that Gooden (or any of the defendants) were told about these performance problems. Third, defendants argue that, because these allegedly fraudulent statements were corrected just two months later, plaintiff's alleged securities fraud scheme is "wholly illogical," and, in the absence of allegations of motive, the Court should not infer scienter. *See In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 288 (S.D.N.Y.2006) (court may refuse to infer scienter where allegations presume economically irrational behavior).

The Court disagrees. The allegations are more than specific enough to allege not

---

**3.** The IS & GS backlog listed confirmed, tangible programs that were likely to generate revenues for Lockheed Martin. Plaintiff alleges that backlog is a metric used by Lockheed Martin investors to measure sales going forward. Am. Compl. ¶ 64.

only that defendant Gooden had knowledge of or recklessly disregarded the false financial picture Lockheed Martin had presented to the public, but also that she was actively involved in the misconduct. The allegations are corroborated by multiple confidential witnesses. That plaintiff has not pled motive does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading scienter, not just an alternative test. Moreover, as a matter of common sense, Gooden could have had all sorts of motives, from winning business to enhancing her own short-term position in the company to bowing to pressure for enhanced results, etc., etc. for making the misstatements she is alleged to have made. The Court will not speculate at this preliminary stage, nor should it, since the law clearly allows a plaintiff to plead scienter and survive a motion to dismiss if it alleges "strong circumstantial evidence of conscious misbehavior." *ATSI Commc'ns,* 493 F.3d at 99. The allegations here do that.

*With respect to defendants Stevens and Tanner,* defendants argue that the Amended Complaint fails to identify any specific information these two defendants had regarding the allegations. It merely states that, according to CW2, Stevens and Tanner received information about IS & GS from Gooden and Gooden's finance manager. Am. Compl. ¶ 36. Such a general allegation, defendants argue, is patently insufficient. *See In re Wachovia Equity Sec. Litig.,* 753 F.Supp.2d 326, 351 (S.D.N.Y.2011) (allegation that individual defendants "received reports detailing" problems insufficiently specific); *Local No. 38 IBEW Pension Fund v. Am. Express Co.,* 724 F.Supp.2d 447, 461–62 (S.D.N.Y. 2010) (CW's allegation that CFO "received 'detailed' information fails" absent specificity regarding details provided) (collecting cases); *eSpeed,* 457 F.Supp.2d at 293 (com-

plaint must allege where and what confidential witness told CEO).

In response, plaintiff relies on the so-called "core operations" doctrine to argue that the Court can impute Gooden's scienter to Stevens and Tanner. This doctrine states that if "a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 489 (S.D.N.Y.2004) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Plaintiff argues that knowledge of falsity and all relevant facts can be imputed to Stevens and Tanner where they "should have known" of facts relating to core operations—here, the status of IS & GS. *See id.; In re Winstar Commc'ns,* No. 01 CV 3014(GDB), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).

Defendants challenge the continued vitality of the core operations doctrine after Congress heightened the pleading standard for securities fraud cases through the PSLRA, arguing that the "trajectory" in this District has been against inferring scienter based on "core operations" allegations. *See Wachovia,* 753 F.Supp.2d at 353 (collecting cases). However, although the Second Circuit has not expressly ruled on whether the core operations doctrine survives the PSLRA, it has very recently endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter, albeit in dicta in a non-precedential opinion. *See Celestica,* 455 Fed.Appx. at 14 n. 3.

In any event, the Court need not rely solely on the core operations doctrine to conclude that plaintiff has satisfied the requirements of pleading scienter. It is true that the Amended Complaint does not allege facts showing Stevens and Tanner knew their statements were false. It does allege, however, that Stevens and Tanner made specific statements about the projections and performance of IS & GS. *See* Am. Compl. ¶¶ 71–77, 82–83. The specificity of these statements regarding IS & GS is strong circumstantial evidence that Stevens and Tanner were receiving some form of specific information on IS & GS. Moreover, the Amended Complaint plausibly alleges that Stevens and Tanner received their information about IS & GS directly from Gooden and Gooden's finance manager. *Id.* ¶ 36. Given that this Court has found the allegations against Gooden more than sufficient to allege scienter, this leaves only two possible conclusions one could draw with respect to the scienter of Stevens and Tanner: 1) they knew or recklessly disregarded what Gooden knew and what she was allegedly doing (*e.g.*, misstating the backlog); or 2) Gooden misled them. The Amended Complaint alleges no facts that favor one scenario over the other. Thus, as to the scienter of Stevens and Tanner, the Court is faced with what is effectively a tie.

A close reading of the Supreme Court's opinion in *Tellabs*, as well as Judge Posner's implementation of *Tellabs* on remand, demonstrates that, at the motion to dismiss stage, a tie on scienter goes to the plaintiff. The precise holding of the Supreme Court in *Tellabs* is that scienter need be only *"at least as* compelling as any opposing inference of nonfraudulent intent."* 551 U.S. at 314, 127 S.Ct. 2499 (emphasis supplied). On remand after the Supreme Court's opinion, Judge Posner, writing for the Seventh Circuit Court of Appeals, reversed the District Court's de-

cision to dismiss the suit in a situation very similar to the instant case. *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs II)*, 513 F.3d 702 (7th Cir.2008) (Posner, J.); *accord Dynex*, 531 F.3d at 195. Judge Posner noted that management's public statements about "strong" demand for the company's products were either knowingly false or based on false information from lower-level employees. *Tellabs II*, 513 F.3d at 706–708. Judge Posner noted that these statements were about Tellabs's "flagship" product, and that defendants' argument that no member of management knew that their statements about their flagship product were false was "very hard to credit." *Id.* at 709. Accordingly, Posner concluded that the inference that management knew its statements were false was at least as plausible as being misled by underlings, if not more likely. *Id.* at 710–11; *see also Celestica*, 455 Fed.Appx. at 16 (reversing district court's dismissal of securities class actions where allegations made by confidential witnesses made inference of scienter at least as likely as management being unaware).

Here, plaintiff has alleged specific instances through which information was given to defendant Gooden before the misstatements were made, and has adequately alleged circumstantial evidence showing that Gooden passed on some kind of information on IS & GS to Stevens and Tanner to allow them to make specific statements about the growth potential of IS & GS, lack of performance issues, etc. This is unlike, for example, *American Express*, where plaintiff "fail[ed] to demonstrate, in even the most general terms, that adverse [information] was transmitted to the Individual Defendants." *Am. Express Co.*, 724 F.Supp.2d at 461. Moreover, the confidential witnesses who are the sources of the information pled in the Amended Complaint are former members of mid-level

management in IS & GS, two of whom allegedly had regular direct interaction with Gooden. Am. Compl. ¶¶ 21–28; *see Celestica*, 455 Fed.Appx. at 13–14 (noting where witnesses are described with particularity showing they likely possessed the information they allege to possess, confidential witnesses are sufficient to satisfy pleading scienter). Accordingly, the Court finds that the factual allegations of the Amended Complaint are sufficient to draw the requisite "strong inference" of scienter as to defendants Stevens and Tanner.

The final argument for dismissal of Count I relates only to defendant Gooden. Specifically, Gooden argues that because she did not herself make any of the statements that are alleged to be false and misleading, plaintiff cannot bring a claim against her. To support its claim for securities fraud against defendant Gooden, plaintiff relies on the "group pleading" doctrine, which allows a plaintiff to rely on a presumption that *written* statements that are "group-published," *e.g.*, SEC filings and press releases, are statements made by all individuals "with direct involvement in the everyday business of the company." *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020(CM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011) (noting group pleading developed in consequence to "rigors" of Rule 9(b)'s requirement of pleading fraud with particularity). Group pleading, however, as is clear from its requirements, is "extremely limited in scope." *Id.; In re Pfizer Inc. Sec. Litig.*, 584 F.Supp.2d 621, 638 (S.D.N.Y.2008).

Defendants argue that the Supreme Court's decision in *Janus Capital* casts into doubt the continued vitality of the group pleading doctrine. *Janus Capital Group, Inc. v. First Derivative Traders*, — U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). In *Janus Capital,* the Court

held that the "maker" of a statement for 10b–5 liability must be someone with "ultimate authority" over the statements made, and rejected primary liability for an investment adviser that helped prepare the prospectuses of its mutual fund client. *Id.* at 2302–05. Accordingly, defendants argue, because the Court distinguished between liability for the "maker" of the statement who has "ultimate authority" over it, and no liability for someone who merely "provides the false or misleading information" and "participat[ed] in [its] drafting" but did not have "ultimate authority," the Court implicitly abrogated group pleading as a doctrine. *Id.* at 2302–04; *see also Rolin v. Spartan Mullen Et Cie*, S.A., No. 10 Civ. 1586(CM), 2011 WL 5920931, at *5–6 (S.D.N.Y. Nov. 23, 2011) (McMahon, J.) (whether *Janus Capital* abrogated group pleading "is an open question"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F.Supp.2d 395, 417 (S.D.N.Y.2011) (Koeltl, J.) (holding under *Janus Capital* that individuals who did not sign one particular statement, which lacked any indication that those defendants had any authority over its contents, "cannot be held liable for any alleged misstatements" in it). Moreover, defendants argue that, although the Second Circuit has not addressed the issue, other circuits that have addressed group pleading have held that the PSLRA's mandate that a plaintiff plead specific facts as to each defendant has effectively eliminated group pleading as a viable doctrine. *Winer Family Trust v. Queen*, 503 F.3d 319, 336–37 (3d Cir.2007); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir.2004); *Makor Issues & Rights Ltd. v. Tellabs, Inc. (Tellabs I)*, 437 F.3d 588 (7th Cir.2006), *rev'd on other grounds*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Despite all this, the latter argument (premised on the PSLRA) has been reject-

ed by most of the judges in this District who have addressed the effect of the PSLRA on the group pleading doctrine. As recognized by Judge Kaplan, they "have found that the doctrine is alive and well." *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 439 & n. 42 (S.D.N.Y.2005) (Kaplan, J.); *accord Dodona I, LLC v. Goldman, Sachs & Co.,* No. 10 Civ. 7497(VM), 2012 WL 935815, at *17 n. 13 (Mar. 21, 2012) (Marrero, J.); *Jimenez v. Brazil Ethanol, Inc.,* No. 11 Civ. 3635(LBS), 2011 WL 5932600, at *4 (S.D.N.Y. Nov. 29, 2011) (Sand, J.) (group pleading doctrine "well-established"); *SEC v. Landberg,* 836 F.Supp.2d 148, 156 (S.D.N.Y.2011) (Castel, J.) (recognizing doctrine); *In re Lehman Bros. Sec. & Erisa Litig.,* 799 F.Supp.2d 258, 276 n. 106 (S.D.N.Y.2011) (Kaplan, J.); *Stratte-McClure v. Stanley,* 784 F.Supp.2d 373, 384 (S.D.N.Y.2011) (Batts, J.); *In re MRU Holdings Sec. Litig.,* 769 F.Supp.2d 500, 504 n. 4 (S.D.N.Y.2011) (Berman, J.); *In re Smith Barney Transfer Agent Litig.,* 765 F.Supp.2d 391, 401 (S.D.N.Y.2011) (Pauley, J.); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 763 F.Supp.2d 423, 485 (S.D.N.Y.2011) (Sweet, J.); *In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 239 (S.D.N.Y.2010) (Stein, J.); *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 641–42 (S.D.N.Y.2007) (Lynch, J.); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 399 (S.D.N.Y.2005) (Sweet, J.). *But see Cross Media,* 314 F.Supp.2d at 262 (Patterson, J.) (suggesting group pleading doctrine was "inappropriate" after PSLRA); *Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (Martin, J.) ("[T]he PSLRA has eliminated the 'group pleading' doctrine.").

As for *Janus Capital,* that case addressed only whether *third parties* can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability, *see Janus Capital,* 131 S.Ct. at 2302, and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to "make" an SEC filing, such that a misstatement has more than one "maker." *See City of Roseville,* 814 F.Supp.2d at 417 n. 9.

Moreover, as to the PSLRA's requirement that a plaintiff plead securities fraud with specificity as to each defendant, there is no tension between requiring a plaintiff to allege specific facts for individual defendants and presuming that multiple corporate officers may work as a group to produce particular documents. *Pfizer,* 584 F.Supp.2d at 638. It is for this reason that, in the cases cited above, most judges in this District have continued to conclude that group pleading is alive and well. This Court agrees.

■ The written statements of Lockheed Martin referenced in the Amended Complaint are the press release, which stated Lockheed Martin's projected profits and operating margins for both the second quarter and 2008 overall, and the 10–Q, which contained a statement describing IS & GS's performance in the first quarter. Am. Compl. ¶¶ 67, 79. Plaintiff's conclusory pleading that each defendant had "ultimate authority" over the statements is clearly insufficient to adequately plead Gooden made these statements. *Id.* ¶ 13; *see Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("formulaic recitation" of labels and conclusions "will not do"). But the Amended Complaint alleges, *inter alia,* that various division leaders in IS & GS told Gooden that the projections for IS & GS for 2009

were unattainable and overstated, based on information that shareholders did not know. *Id.* ¶ 36. In light of this allegation, and considering that Gooden was (1) the executive in charge of the division whose misconduct is at the heart of plaintiff's claims; (2) an officer of Lockheed; and (3) one of seven individuals listed as part of Lockheed's "Leadership," *id.* ¶ 8(c), it is appropriate to invoke the group pleading doctrine and presume that Gooden, a high-level executive at Lockheed who played a daily role in the company's operations, was a "maker" of Lockheed's projections insofar as they related to IS & GS. *See Camofi,* 2011 WL 1197659, at *8.

Accordingly, the claim against Gooden will not be dismissed for failing to allege a "statement" she personally made. The Court notes, however, that the claim against Gooden can only proceed on the theory that what was in Lockheed Martin's *written* statements—i.e., the 10–Q and the press release—was false. Gooden cannot be held liable based on what Stevens and Tanner said in their *oral* remarks. *In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* 381 F.Supp.2d 192, 220 (S.D.N.Y. 2004).

■ For the foregoing reasons, the motion to dismiss Count I must be denied. But Counts II and III are a different story. Specifically, plaintiff has failed to allege a plausible alternative theory of control person liability against the Individual Defendants pursuant to Sections 20(a) and 20(b) of the Exchange Act—Counts II and III of the Amended Complaint. 15 U.S.C. § 78t(a)-(b). In order to plead control person liability, a plaintiff must demonstrate: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) the controlling person's culpability in the pri-

mary violation. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Although the Amended Complaint summarily alleges that the Individual Defendants controlled Lockheed Martin, the facts alleged all address the primary violation committed by the Individual Defendants themselves, which is imputed to Lockheed Martin. *See Dynex,* 531 F.3d at 195. The Complaint does not allege any plausible alternative theory where defendants are not primary violators and yet can still be held liable on a secondary violation theory through controlling Lockheed Martin. *See Kalnit v. Eichler,* 85 F.Supp.2d 232, 246 (S.D.N.Y.1999), *aff'd on other grounds* 264 F.3d 131 (2d Cir.2001) (dismissing § 20(a) claim for lack of scienter, and noting that § 20(a) also failed where plaintiff's theory of case involved individual defendants as primary violators); *see also PR Diamonds, Inc. v. Chandler,* 91 Fed.Appx. 418, 442 & n. 4 (6th Cir.2004) (questioning viability of so-called "double-back" control person liability). Accordingly, Counts II and III of the Amended Complaint are dismissed.[4]

In sum, the Court hereby reaffirms its bottom-line Order of February 15, 2012 denying the motion to dismiss Count I but granting the motion to dismiss Counts II and II.

---

**4.** The Court therefore does not address defendants' argument that Section 20(b) does not create a private right of action that plaintiff can assert.